THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

THOMAS E. PEREZ, Secretary of Labor,

      Plaintiff,

  v.

PACIFIC SHIP REPAIR &
FABRICATION, INC.,

      Defendant.

CASE NO. C14-1773-JCC

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

   This matter was tried to the Court on November 2nd, 3rd, and 4th, 2015. (Dkt. Nos. 37, 38, and 39.) Plaintiff Thomas E. Perez, the Secretary of Labor, was represented by attorneys Abigail G. Daquiz and Jessica M. Flores. Defendant Pacific Ship Repair & Fabrication, Inc. ("PacShip") was represented by its attorneys Laurie Lootens Chyz and Andrew G. Murphy. The Court heard testimony from the following witnesses: Jacob Ewer, Bernice Coleman, Ed Delach, Robert Davis, and Diane Rebollo for the Secretary; and Robert Davis, Greg Bryant, Richard Hill, David Leonard, Todd Bevier, and David Conner for PacShip. The Court also considered documents, photographs, and videos admitted into evidence as trial exhibits ("Ex").

   This case is now before the Court for judgment on claims brought by the Secretary of Labor ("the Secretary") against PacShip under the Occupational Safety and Health Act, 29 U.S.C. §§ 651 et seq. ("the Act"). The Secretary alleges that PacShip violated Section (11)(c)(1)

1  of the Act (29 U.S.C. § 660(c)(1)) by discriminating against its employee, Bernice Coleman,

2  because of her protected activities under the Act.

3        Having heard the testimony of the witnesses, considered the exhibits admitted at trial, and

4  having heard the arguments of counsel, the Court enters judgment in favor of PacShip and

5  DISMISSES the Secretary's claims with prejudice.

6  **I.     FINDINGS OF FACT**

7  **A.     Ms. Coleman's Employment with PacShip**

8        1.     PacShip is a corporation that performs maintenance, repair and modernization of

9  U.S. Navy ships and associated equipment. (Dkt. No. 36 at 2.)

10        2.     In September and October of 2012, PacShip contracted to repair the USS

11  Ingraham, a ship moored at a secure pier at Naval Station Everett in Washington State. (*Id.*)

12        3.     In September 2012, PacShip had a "Safety Bonus Program" that included a

13  monthly drawing for cash and prizes. Employees who had an accident which required medical

14  treatment were not eligible to participate in that monthly drawing. To be eligible for the drawing,

15  employees had to have worked at PacShip for 30 days. (Plaintiff's Ex. 3.)

16        4.     PacShip also had an Eye Protection Program that required double eye protection

17  (the use of both a face shield and safety glasses) when an employee is needle gunning.

18  (Defendant's Ex. A-13.)

19        5.     To complete repair of the U.S.S. Ingraham, PacShip had a temporary demand for

20  increased labor. In September 2012, PacShip hired a group of Journeyman Laborers from a union

21  hall, including Ms. Coleman, to meet that temporary demand. At the time of hire, PacShip

22  planned to lay off the group of newly hired laborers as the work load for the U.S.S. Ingraham

23  repair diminished. PacShip has a general policy of "Last-in; First-out," meaning that the most

24  recently hired workers will generally be the first to be laid off. (Dkt. No. 35 at 2.)

25        6.     PacShip hires Journeyman Laborers with the expectation that they have the skills

26  of a Journeyman. These expected skills include being familiar with how to use a needle gun and

1    other power tools to successfully abate paint, how to run air lines and power lines through a ship,

2    how to plug power tools into air lines, and how to build a containment for fire watch. (*Id.*)

3          7.      On the employment application that Ms. Coleman submitted to PacShip, she

4    stated that she had worked as a Journeyman Laborer at another shipyard from March 2005 to

5    August 2012. (Defendant's Ex. A-4.)

6          8.      In fact, as Ms. Coleman testified, she had performed only fire watch and clean-up

7    duties during intermittent short-term assignments at that shipyard between 2005 and 2012. When

8    Ms. Coleman started at PacShip, it is undisputed that she did not have experience with the use of

9    a needle gun or any other power tools to abate paint, running air lines or power lines through a

10   ship, or plugging power tools into air lines. Ms. Coleman did not know how to use the needle

11   gun and could not plug it into the air line to make it operable. (Dkt. No. 26 at 2.)

12         9.      Ms. Coleman was an employee of PacShip from September 20, 2012 through

13   October 15, 2012. (Dkt. No. 36 at 2.) At Ms. Coleman's new employee orientation on September

14   20 and September 21, 2012, she received training on PacShip's company policies and safety

15   program. (*See* Dkt. No. 36 at 3, Defendant's Ex. A-16.)

16         10.     Relevant personnel for PacShip (all of whom testified at trial) include: labor leads

17   Robert Davis and Todd Bevier, labor foreman David Leonard, lead safety specialist David

18   Conner, production operations manager Rich Hill, and Northwest Division general manager

19   Gregory Bryant. (*See* Dkt. No. 36 at 7–8.)

20   **B.    Ms. Coleman's Injury and Reporting**

21         1.      On September 24, 2012, Ms. Coleman started her first job assignment which was

22   to remove paint from an interior area of the ship using a method called "needle-gunning." (Dkt.

23   No. 36 at 3.) Ms. Coleman testified that she asked her lead, Mr. Davis, for a face-shield.

24         2.      Conflicting testimony was presented as to whether Ms. Coleman was provided a

25   face-shield. However, it is undisputed that on September 24, 2012, at approximately 12:45 PM,

26   Ms. Coleman got paint chips in her eyes during the process of needle-gunning. Ms. Coleman was

helped to the eyewash station by Mr. Bevier, another lead in Ms. Coleman's department. Ms. Coleman worked the rest of her shift. (Dkt. No. 36 at 3.)

3.      Repeated testimony demonstrated that Navy and PacShip personnel walked the U.S.S. Ingraham multiple times a day monitoring for safety violations, and if workers had been needle gunning without proper PPE, they would have been stopped. Mr. Bevier testified that he handed Ms. Coleman a face shield, saw her wearing one during his frequent observations of the work crew, and that he helped her clean her face shield before her injury. Mr. Davis testified that he saw Ms. Coleman wearing a face shield. The Court concludes that Ms. Coleman was provided a face shield while she was needle gunning. The Court concludes that her injuries must have occurred despite the presence of a face shield.

4.      On the next day, September 25, 2012, Ms. Coleman asked Mr. Davis for an injury report form. She did not receive a copy of the form but was referred to Mr. Conner, the lead safety specialist. On this same day, Mr. Bevier was instructed by David Conner, Safety Specialist, to write down an account of Ms. Coleman's injury.

5.      On Wednesday, September 26, 2012, Ms. Coleman again asked Mr. Davis about how to report her injury. In response, Mr. Davis told her about the Safety Bonus Program and again referred her to Mr. Conner. Mr. Conner had called Mr. Davis and asked him to talk to Ms. Coleman about her injury and this monthly drawing. Mr. Davis told her about the prizes and drawing, including saying "you could receive $225." Mr. Davis relayed to Ms. Coleman that if she reported her injury, her name would be pulled from drawing. Ms. Coleman told Mr. Davis that she was not interested and wanted to report her injury.

6.      On September 27, 2012, Ms. Coleman sought medical attention for her eyes and called in sick from work. At 6:15 PM, Ms. Coleman faxed a doctor's report and prescription receipt to Nancy Cole, from the Human Resources department at PacShip and sent her an email. (Plaintiff's Ex. 9 at PacShip 00000598–600.) Ms. Coleman reported to Ms. Cole that she "asked for a safety shield and was told that there wasn't any and too [sic] proceed with my job." In this

email she informed Ms. Cole that she had requested an accident report from Mr. Davis and Mr. Bevier and that an accident report had not been completed. She also requested information about the chemicals in the paint that may have cut her eyes, referring to an MSDS (or material safety data sheet). This communication was forwarded to Mr. Conner in the Safety Department and Mr. Gregory Bryant, the General Manager for PacShip's Puget Sound operations, on September 28, 2012.

7.      On the morning of September 28, 2012, PacShip received Ms. Coleman's fax and medical report. Mr. Conner had Mr. Davis write a report regarding paint chips getting in Ms. Coleman's eyes. (Defendant's Ex. A-24.) Mr. Conner prepared Occupational Safety and Health Administration ("OSHA") forms 300 and 301. (Defendant's Ex. A-2.) Another injury report form was filled out for the Navy. (Defendant's Ex. A-14.)

8.      On September 28, 2012, PacShip held a safety meeting. This was a meeting of the entire Department 17, "Firewatch Laborers" which included Ms. Coleman's short-term crew. During this meeting, Mr. Leonard gave Ms. Coleman extra pieces of PPE and, according to Ms. Coleman, asked her, "Is that enough PPE for you?" Mr. Leonard acknowledged giving all employees extra PPE. He did not specifically deny Ms. Coleman's account of what he said.

9.      On September 28, 2012, Mr. Conner gave Ms. Coleman an Injury Form that he had filled out for her based on his discussions with Mr. Davis and Mr. Bevier and asked her to sign it. This form did not contain information about how Ms. Coleman was injured—specifically, it did not include that she alleged she did not have the required PPE to perform the job safely. In preparing the injury report form, PacShip managers did not interview Ms. Coleman or witnesses about how Ms. Coleman's eyes were cut by paint chips. (Defendant's Ex. A-20.) Instead, Mr. Conner had Ms. Coleman's leads draft statements about her injury. (Defendant's Exs. A-23 and A-24.) Ms. Coleman refused to sign the form as filled out by Mr. Conner.

10.     On October 4, 2012, PacShip's insurer asked the Safety Specialist for PacShip at the company's headquarters in San Diego where the "First Report of Injury" was for Ms.

Coleman. (Plaintiff's Ex. 9 at PacShip 00000601.) Headquarters in turn asked Mr. Conner and

others from the Safety Department in Washington for information about this injury.

11.     There is disputed evidence as to which day Ms. Coleman was provided with a

blank injury form: PacShip argues that it was provided on September 28, 2012 and Ms. Coleman

testified that it was not given to her until October 4, 2012. It is undisputed that an injury report

form filled out by Ms. Coleman was submitted on October 4th. (Defendant's Ex. A-15.)

12.     The injury report filed by Ms. Coleman contained information about how she was

injured, including the fact that she was needle-gunning without being provided a full face shield.

(Defendant's Ex. A-15.)

13.     On October 6, 2012, Ms. Coleman filed a Notice of Safety or Health Hazard with

OSHA after calling the OSHA Bellevue Area Office. (Dkt. No. 36 at 3.)

**C.     Ms. Coleman's Layoff**

1.     Mr. Leonard regularly gets evaluations of workers' performance from Mr. Davis

and Mr. Bevier, and from foreman from other trades. When PacShip needs to make layoffs due

to lack of work, Mr. Leonard identifies the employees with the least amount of seniority, and

then identifies individuals from that group that he believes should be laid off based on job

performance. Mr. Leonard then recommends to Rich Hill, the PacShip Production Manager, the

individuals who should be laid off, and Mr. Hill decides who is laid off. Mr. Davis and Mr.

Bevier do not suggest to Mr. Leonard who they believe should be laid off. Mr. Conner plays no

role in layoff decisions.

2.     After her first day, Ms. Coleman's supervisors concluded she had poor job

performance. Mr. Hill saw Ms. Coleman "standing around" on at least three occasions when she

should have been working on clean up. Mr. Leonard found that Ms. Coleman did not follow his

directions. For example, as testified, Mr. Leonard once directed her to repair the deck covering

and later observed her wiping down equipment instead. Mr. Leonard also received complaints

from foremen for other trades that Ms. Coleman disappeared from assignments, and Mr. Leonard

testified that Ms. Coleman needed to be highly supervised. Mr. Bevier observed that Ms. Coleman was below standards, could not plug her needle gun into the air line, and that she repeatedly talked on her cell phone during work hours. Mr. Bevier told Ms. Coleman that she was lagging behind on her needle gunning, that she needed to improve her technique, and that she needed to stay off her phone during work hours. Mr. Davis testified that Ms. Coleman was below journeyman standards, that she could not plug her needle gun into the air line, and that she could not effectively abate paint.

3.     On October 7, 2012, Mr. Leonard decided that PacShip's work on the Ingraham had progressed to the extent that PacShip no longer required its full laborer work crew. In accordance with PacShip's "last-in; first-out" layoff policy, Mr. Leonard looked to the recently hired short-term crew to identify people to lay off. He decided to suggest that two of those laborers, Ms. Coleman and John Chapman, be laid off because of the group last hired, their performance was the weakest. Of particular importance, Mr. Leonard did not know that Ms. Coleman filed her First OSHA Complaint when he decided to recommend her for layoff.

4.     On October 8, 2012, Mr. Leonard and Mr. Hill discussed Mr. Leonard's recommendation to lay off Ms. Coleman and Mr. Chapman. Mr. Leonard recommended that, due to their performance, neither Ms. Coleman nor Mr. Chapman should be eligible for rehire by PacShip.

5.     Ms. Coleman was absent from work on October 8, 2012 for a doctor's appointment. She was also absent on October 9, 2012 for reasons that are unstated. She worked a full day on October 10, 2012.

6.     As several witnesses testified, PacShip management prefers giving verbal correction to employees rather than written warnings. Written warnings are given after an employee fails to respond to verbal warnings and are rare. On October 10, 2012, Mr. Bevier issued Ms. Coleman a written warning for using her cell phone during work hours in violation of

PacShip policy. (Defendant's Ex. A-25.) Mr. Bevier had previously given multiple verbal warnings to Ms. Coleman for her cell phone use.

7.      OSHA inspected PacShip on Oct. 11, 2012. During this inspection, the Compliance Safety and Health Officer, Edward DeLach, announced the focused inspection topics that included availability of PPE, proper logging of injuries, and the availability of MSDS information for the paint chips. (Dkt. No. 36 at 3.) PacShip cooperated with the investigation. Mr. Delach investigated each of the complaints Ms. Coleman alleged in her First OSHA Complaint and found no violations. (Defendant's Ex. A-9.)

8.      Mr. DeLach did not disclose who filed the OSHA complaint. Mr. Conner told Mr. DeLach that he knew who the complainant was because only one person had suffered an eye injury. Mr. DeLach warned that they could be wrong and that it was illegal to retaliate or discriminate against a suspected complainant. Mr. Conner mentioned that the complainant was "low on the seniority list and alone [sic] with a few others was going to be laid off in about a week or two as the job slowed down." (Defendant's Ex. A-1 at OSHA 0380.)

9.      On Friday, Oct. 12, 2012, Mr. Leonard told Mr. Bryant that he intended to lay off someone who had filed an OSHA complaint. Mr. Bryant, General Manager of PacShip's Pacific Northwest Division, advised Mr. Leonard that the decision of which laborers to lay off should not be influenced by whether a laborer filed an OSHA complaint. (Dkt. No. 36 at 3.) Mr. Bryant had no first-hand information about the quality of Ms. Coleman's work.

10.     The day after the OSHA inspection, October 12, 2012, was Ms. Coleman's last day of work. On Oct. 15, 2012, Mr. Leonard laid off Ms. Coleman and one other laborer, Mr. John Chapman.

11.     Every PacShip employee involved in the decision to lay Ms. Coleman off testified that he would have made the same decision even if Ms. Coleman have never reported an injury or contacted OSHA. The Court finds this testimony credible.

12.     PacShip laid Ms. Coleman off because its workload on the U.S.S. Ingraham was diminishing, and PacShip no longer required its full crew of laborers. Ms. Coleman was selected for layoff because she did not have seniority and was the least productive member of the recently hired short-term work crew.

13.     PacShip noted on Ms. Coleman's separation paper the following: "lack of work" and "no rehire." (Dkt. No. 36 at 4.) All laborers hired at the same time as Ms. Coleman were laid off by the end of December 2012 because the work load for the U.S.S. Ingraham repair had diminished. The "no rehire" directive was added to Ms. Coleman's Separation Notice after Mr. Rich Hill signed it on October 15, 2012.

14.     After Ms. Coleman and Mr. Chapman were laid off, PacShip hired Sabrina Hayes as a lead laborer. This is a different position than the position that Ms. Coleman had. Ms. Hayes had worked for another ship repair company, but that employer laid her off due to downsizing. Mr. Bevier had previously worked with Ms. Hayes and had told PacShip that Ms. Hayes was an asset that PacShip would need in the future, and that PacShip should hire her when it had the chance.

**D.     The Second OSHA Complaint**

1.     On October 15, 2012, Ms. Coleman filed a whistleblower complaint with OSHA alleging that PacShip discriminated against her in violation of § 11(c)(1) of the Act. Diane Rebollo investigated the Second OSHA Complaint on behalf of OSHA.

2.     In response to OSHA's notification of investigation regarding Ms. Coleman's retaliation complaint, Mr. Bryant wrote on November 14, 2012 that Ms. Coleman and Mr. Chapman were laid off as a result of a reduction in workload and that the people selected for layoff were "the least productive and least skilled." (Plaintiff's Ex. 2.) Appended to this letter was a series of notes written by Mr. Leonard, Mr. Davis and Mr. Bevier written in the second week of November 2012 regarding Ms. Coleman's performance.

3.      Following Ms. Rebollo's investigation, the Secretary determined that PacShip violated 29 U.S.C. § 660(c), and filed this action on November 19, 2014.

## II.    CONCLUSIONS OF LAW

### A.    Standard of Review

1.      This Court has subject matter jurisdiction over this action pursuant to 29 U.S.C. § 660(c)(2) and 28 U.S.C. § 1345.

2.      Venue is proper in this district pursuant to 28 U.S.C. § 1391.

3.      PacShip is an employer subject to the requirements of the Occupational Safety and Health Act (the "Act") 29 U.S.C. §§ 651, *et seq*.

4.      The Secretary's claim arises under the Act's whistleblower protection provision, 29 U.S.C § 660(c). That statute, also called "Section 11(c)" of the Act, provides :

> No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by this chapter.

5.      It is uncontested that PacShip is a 'person' subject to the Act and that Ms. Coleman is an employee entitled to the Act's protections. *See* 29 U.S.C. §§ 652(4)–(6).

6.      The Ninth Circuit has not yet established a test for evaluating whistleblower discrimination claims under the Act, but district courts within the Ninth Circuit generally apply the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) when evaluating other retaliation claims without statutorily established tests, such as Title VII retaliation claims. "In light of the substantial similarities between [Title VII and the Act], courts routinely import principles developed in the Title VII context into Section 11(c) analyses." *Perez v. U.S. Postal Service*, 76 F.Supp.3d 1168, 1186 – 87 (W.D. Wash. 2015); *see also Solis v. Consolidated Gun Ranges*, 2011 WL 1215028 at *7 (W.D. Wash. Mar. 30, 2011) (applying burden-shifting test in bench trial on OSHA retaliation claim). The Court finds it is appropriate

1 to evaluate the Secretary's whistleblower claim starting with the *McDonnell Douglas* burden-

2 shifting framework.

3        7.      Under the *McDonnell Douglas* framework, once a plaintiff establishes a prima

4 facie case of retaliation, the burden shifts to the defendant to articulate a legitimate non-

5 discriminatory reason for the adverse employment action. *Steiner v. Showboat Operating Co.*, 25

6 F.3d 1459, 1464–65 (9th Cir. 1994). "If the defendant carries the burden of satisfactorily

7 articulating a legitimate, non-retaliatory reason at trial, the legally mandatory inference of

8 retaliatory discrimination arising from the plaintiff's prima facie case drops away." *Yartzoff v.*

9 *Thomas*, 809 F.2d 1371, 1377 (9th Cir. 1987). The burden of production shifts back to the

10 plaintiff to show that the defendant's explanation is a pretext for impermissible retaliation. *Id.*

11 This burden of production merges with the plaintiff's ultimate burden of persuading the court

12 that improper retaliation occurred. *Id.*

13        8.      To establish a prima facie case of retaliation, a plaintiff must demonstrate by a

14 preponderance of the evidence that (1) the alleged victim engaged in a protected activity, (2) the

15 alleged victim suffered an adverse employment action, and (3) a causal link between the

16 protected activity and the adverse employment action. *Cornwell v. Electra Cent. Credit Union*,

17 439 F.3d 1018, 1034–35 (9th Cir. 2006) (citation omitted). Each element may be established by

18 direct or circumstantial evidence. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003).

19 Proximity in time between a protected action and alleged retaliatory employment decision can

20 create an inference that satisfies the third prong. *Yartzoff*, 809 F.2d at 1376.

21 **B.**      **The Secretary Has Established a Prima Facie Case of Discrimination**

22        1.      The Secretary has established a prima facie case of discrimination. Filing an

23 injury report and filing a complaint with OSHA are both protected activities under the Act, and

24 Ms. Coleman did both. She was laid off, which is an adverse employment action. The temporal

25 proximity between her protected activity and her layoff is sufficient to create an inference that

26 her protected activity caused her layoff.

FINDINGS OF FACT AND CONCLUSIONS OF
LAW
PAGE - 11

2.      Having established a *prima facie* case, the Secretary has created "a rebuttable presumption that the employer unlawfully discriminated against" Ms. Coleman. *U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. at 714–15 (1983) (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). To rebut this presumption, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *Burdine*, 450 U.S. at 255. In other words, the defendant must "produc[e] evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, non-discriminatory reason." *Id.* at 254.

## C.     PacShip Has Shown a Legitimate, Non-Discriminatory Reason for Ms. Coleman's Layoff

1.      PacShip met its burden to articulate a legitimate non-discriminatory reason for laying off Ms. Coleman. Ms. Coleman's lack of seniority and poor job performance were legitimate bases to lay her off.

2.      Accordingly, the "inference of retaliatory discrimination arising from the plaintiff's prima facie case drops away," and the Secretary bears the burden of establishing by a preponderance of the evidence that PacShip's explanation for laying Ms. Coleman off is pretext for retaliatory discrimination. *See Yartzoff*, 809 F.2d 1371, 1377 (9th Cir. 1987). To prevail, the Secretary must establish, by indirect or direct evidence that Ms. Coleman's protected activity actually caused her layoff. *Equal Emp't Opportunity Comm'n v. Micron Tech., Inc.*, 32 F. App'x 446, 450 (9th Cir. 2002); *see also Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015) (holding a plaintiff asserting retaliation "must establish causation at two different stages of the *McDonnell Douglas* framework: first, in making a prima facie case, and second, in proving pretext and satisfying her ultimate burden of persuasion.").

3.      The regulations governing whistleblower claims under the Act do not specify when courts should apply "substantial reason" or "but-for" causation. See 29 C.F.R. § 1977.6(b). The Court need not clarify that uncertainty because the Secretary cannot meet either standard.

**D.**     **The Secretary has Not Demonstrated That PacShip's Reasons for Laying Ms. Coleman Off are Pretext**

1.     The direct evidence in this case is in PacShip's favor. PacShip has a "Last-in; First-out" layoff policy, and Ms. Coleman was a member of the most recently hired group. At the time she was hired, PacShip planned to lay the workers off on a rolling basis as the work wound down. At the time of her layoff, work was winding down, Ms. Coleman lacked seniority and was the least productive member of the member of the most recently hired workers.

2.     Furthermore, when PacShip became aware that Ms. Coleman engaged in the protected activity of filing an OSHA complaint, its general manager instructed Mr. Leonard that his lay off recommendation should be based solely on job performance, and that the OSHA Complaint should have no bearing on it. That instruction complies with federal law. *See* 29 C.F.R. § 1977.6. ("An employee's engagement in activities protected by the Act does not automatically render [her] immune from discharge or discipline for legitimate reasons, or from adverse action dictated by non-prohibited considerations."). The overwhelming direct evidence shows that Ms. Coleman was selected for layoff because of her lack of seniority and poor job performance.

3.     Although the temporal proximity between Ms. Coleman's protected activity and the adverse employment action was enough for the Secretary to establish a prima facie case of discrimination, it is not sufficient to establish causation. *See Brown v. City of Tucson*, 336 F.3d 1181, 1187–88 (9th Cir. 2003) (holding that close temporal proximity between protected activity and disciplinary investigation of complaining employee did not necessarily imply a retaliatory motive). In this case, the evidence regarding the temporal proximity between the protected activity and PacShip's decision to lay Ms. Coleman off fails to show that the protected activity caused the lay off.

4.     The evidence does not show a link between PacShip's knowledge of the First OSHA Complaint and its decision to lay Ms. Coleman off. Mr. Davis and Mr. Bevier did not know about the First OSHA Complaint when they gave their evaluations of Ms. Coleman's

1   performance to Mr. Leonard. Mr. Leonard decided to recommend Ms. Coleman for layoff before

2   the OSHA inspection put PacShip on notice that she filed the First OSHA Complaint. Mr. Hill

3   subsequently approved Ms. Coleman's layoff without knowledge that she filed the First OSHA

4   Complaint. Mr. Bryant expressly directed Mr. Leonard to base his layoff recommendations

5   solely on job performance, and directed that the OSHA complaint should have no bearing on it.

6   And Mr. Conner, who was heavily involved in Ms. Coleman's reporting of her injury and who

7   communicated to Mr. DeLach that he knew who the OSHA Complaint was filed by, played no

8   role in the decision-making surrounding Ms. Coleman's layoff. Under these circumstances,

9   PacShip's knowledge of Ms. Coleman's OSHA complaint and does not establish that Ms.

10  Coleman's layoff was retaliatory.

11          5.      Because PacShip is subject to frequent government inspection, the evidence has

12  not shown that the OSHA inspection of PacShip's work sites caused PacShip to retaliate against

13  Ms. Coleman. The evidence establishes that the OSHA inspection was not a matter of concern

14  for PacShip. PacShip is accustomed to operating in a highly monitored environment. Its work

15  and its workers are routinely overseen by the Navy, the ship's personnel and shipyard staff.

16  Given the frequency of the government inspections, the Secretary has not proved that the OSHA

17  inspection triggered by Ms. Coleman's complaint caused PacShip to target Ms. Coleman for

18  layoff in response.

19          6.      The Secretary has not established that any delay in filing Ms. Coleman's injury

20  report shows animus by PacShip toward Ms. Coleman and the filing of injury reports. The

21  evidence established that PacShip promptly implemented its reporting procedures upon receiving

22  notice that Ms. Coleman suffered a recordable injury. When Ms. Coleman got paint chips in her

23  eyes, she did not have an injury that was recordable under OSHA regulations. 19 C.F.R.

24  § 1904.7(a). She washed the debris from her eyes at the eyewash station and returned to work on

25  clean-up, a task that was among the regular functions of her job. *See* 19 C.F.R.

26  § 1904.7(b)(4)(ix). No report was required. *Id.*; 19 C.F.R. § 1904.7(a); *see also* 19 C.F.R. §

1904.7(b)(5)(ii)(J). Three days later, when Coleman sought medical treatment beyond first aid, her injury became recordable. 19 C.F.R. § 1904.7(a). PacShip received Ms. Coleman's medical report at the start of business on September 28, 2012. That day, PacShip completed the required OSHA forms related to Ms. Coleman's injury, filed a report with the Navy related to Ms. Coleman's injury, identified the root cause of her injury, and conducted a safety meeting to address and correct the root cause of the injury. Also that day, Mr. Conner gave Ms. Coleman a completed injury report to sign. She wanted to prepare the form herself, and a second, signed version was received six days later. The Court does not conclude that PacShip caused a delay in Ms. Coleman's execution of an injury report. Moreover, any such delay does not establish that PacShip's decision to lay Ms. Coleman off was discriminatory.

7.    The Secretary argued that PacShip's Safety Incentive Program discouraged Ms. Coleman from filing an injury report. The evidence established that the Safety Incentive Program did not dissuade Ms. Coleman from filing her injury report. In addition, PacShip has voluntarily changed the Safety Incentive Program over time to eliminate any potential disincentive to the reporting of injuries. PacShip's Safety Incentive Program does not support an inference that PacShip retaliated against Ms. Coleman for filing an injury report.

8.    The lack of documentation of Ms. Coleman's poor performance in her personnel file does not establish pretext. The evidence showed that PacShip management prefers verbal correction aimed at improving an employee's performance over issuing written warnings. Ms. Coleman's leads and foreman gave her verbal warnings for her job performance, and guidance about how to improve. She did not respond to this feedback and her performance did not improve. In addition, given her status as part of a short-term work crew, and the fact that she only worked eleven (11) days, it is not surprising that she did not receive written warnings of deficient job performance. She was hired to meet a short-term need, and would be laid off when that need no longer existed. During her eleven days of working on the Ingraham, her lead worker found it to be more productive to assign her to less skilled tasks that she could perform, rather

1   than documenting her inability to do Journeyman work. The lack of documentation is consistent

2   with PacShip's policies and practices and Ms. Coleman's tenure at PacShip, not evidence of

3   pretext.

4          9.      PacShip's hiring of Ms. Hayes does not establish pretext. Ms. Hayes was hired for

5   a position that was different from Ms. Coleman's.

6          10.     Ms. Coleman's separation notice, which identified the reason for her layoff as

7   "lack of work," is accurate and does not show pretext. The evidence showed that the reason for

8   Ms. Coleman's layoff was the lack of work at PacShip, and testimony confirmed that she would

9   have worked there longer had there been enough work to support her employment. Ms. Coleman

10  was selected for layoff because of lack of seniority and poor job performance. The evidence also

11  showed that separation notices from different departments at PacShip are prepared by different

12  foremen, so any inconsistency among the entries on those notices is not evidence of pretext.

13         11.     PacShip has shown that it made layoffs on October 15, 2012 due to reduced work

14  load, and that Ms. Coleman was selected for layoff because of lack of seniority and poor job

15  performance. PacShip has demonstrated that it would have made the same decision even if Ms.

16  Coleman had not engaged in protected activities.

17         12.     The Secretary has failed to prove by a preponderance of the evidence that

18  PacShip's explanation for laying Ms. Coleman off is a pretext for retaliatory discrimination. The

19  Secretary has not shown that Ms. Coleman's protected activity caused her layoff. As such, the

20  Secretary's claims are hereby DISMISSED with prejudice.

21         13.     The Clerk shall enter judgment in favor of PacShip in accordance with these

22  Findings and Conclusions, with costs awarded to PacShip.

23         //

24         //

25         //

26         //

FINDINGS OF FACT AND CONCLUSIONS OF
LAW
PAGE - 16

1    DATED this 16 day of November 2015.

2

3

4

5

6

7

8                                                     John C. Coughenour
                                                      UNITED STATES DISTRICT JUDGE
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

FINDINGS OF FACT AND CONCLUSIONS OF
LAW
PAGE - 17